# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| Dakota Rural Action, *et al.*, ) | Civ. Action No. 18-2852 |
| ) | |
| *Plaintiffs*, ) | |
| ) | **PLAINTIFFS' OPPOSITION TO** |
| v. ) | **MOTION FOR REMAND** |
| ) | **WITHOUT VACATUR AND** |
| U.S. Department of Agriculture, *et al.*, ) | |
| ) | **CROSS-MOTION FOR SUMMARY** |
| *Defendants*. ) | **JUDGMENT** |

## MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56, Local Rule 7(h), and the Court's Scheduling and Procedures Order (Dkt. No. 21), Plaintiffs Dakota Rural Action, Institute for Agriculture and Trade Policy, Iowa Citizens for Community Improvement, Citizens Action Coalition of Indiana, Association of Irritated Residents, White River Waterkeeper, Guardians of the Grand Lake St. Marys, Food & Water Watch, and Animal Legal Defense Fund respectfully move this Court to grant summary judgment in their favor on all claims in the First Amended Complaint, on the grounds that Defendant Farm Service Agency's August 3, 2016 Final Rule categorically excluding medium sized concentrated animal feeding operations from review under the National Environmental Policy Act ("NEPA") is arbitrary, capricious, and otherwise in contravention of NEPA and the Administrative Procedure Act. Plaintiffs move for summary judgment in order to ensure that the Court has the authority to vacate the unlawful categorical exclusion.

This motion is based on the following memorandum, declarations, and exhibits supporting this motion, as well as any on subsequently filed reply memoranda.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................... iii

INTRODUCTION ................................................................................................. 1

STATEMENT OF THE CASE ............................................................................... 3

    I.      LEGAL BACKGROUND ON NEPA AND CATEGORICAL
           EXCLUSIONS ........................................................................................ 3

    II.    FACTUAL BACKGROUND .................................................................. 5

           A.  Medium CAFOs are Industrial Operations. .................................... 5

    III.   PROCEDURAL HISTORY OF THE MEDIUM CAFO CATEX ................... 8

           A.  FSA's Establishment of the Medium CAFO CatEx in the
               Final NEPA Implementation Rule. ................................................. 8

           B.  FSA's Procedural Maneuvering in This Case. ............................... 10

    IV.   SUMMARY JUDGMENT STANDARD AND
           STANDARD OF REVIEW. ..................................................................... 11

    V.    PLAINTIFFS' INTERESTS IN THE MEDIUM CAFO CATEX. .................... 12

ARGUMENT ...................................................................................................... 15

    I.      FSA'S CREATION OF THE MEDIUM CAFO CATEX WAS
           ARBITRARY AND CAPRICIOUS AND NOT IN ACCORDANCE
           WITH LAW. .......................................................................................... 15

           A.  FSA Violated NEPA and APA Procedural Requirements in
               Issuing The CatEx. ......................................................................... 15

               i.   FSA did not give notice and accept public comment
                    on the CatEx. ........................................................................ 16

               ii.  FSA cannot retroactively justify its unlawful rule. ............................ 17

           B.  FSA Violated NEPA and the APA Because It Failed to Provide the
               Required Reasoned Basis for the CatEx. ....................................... 19

               i.   FSA did not base the CatEx on relevant facts and
                    failed to consider important factors. ................................. 19

       ii.  FSA did not substantiate its creation of a new categorical exclusion....................................................................21

    C.  The CatEx Unlawfully Excludes Federal Actions with Cumulatively Significant Effects on the Human Environment. ...................23

       i.  FSA must consider all of its numerous medium CAFO funding actions and other CAFO construction actions. ....................24

       ii.  Medium CAFOs produce a variety of significant and harmful effects on the environment. ...................................25

II.    VACATUR IS THE APPROPRIATE REMEDY. ...............................................31

    A.  Vacatur Is the Standard Remedy for Violations of NEPA and the APA.......................................................................32

    B.  There Is No Serious Possibility That FSA Can Substantiate Its Unlawful Rule or Will Promulgate a Lawful Rule on Remand.....................33

    C.  Vacatur Will Return FSA Review to the Prior Rule Process, Which is Far Less Disruptive and Prejudicial than the Current Free-for-All....................................................................35

CONCLUSION..........................................................................................38

# TABLE OF AUTHORITIES

## CASES

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146
(D.C. Cir. 1993) .................................................................................. 32, 33, 35, 37

*Allina Health Servs. v. Sebelius*, 746 F.3d 1102 (D.C. Cir. 2014) ................................ 32

*Am. Oceans Campaign v. Daley*, 183 F. Supp. 2d 1 (D.D.C. 2000) ....................... 23, 31

*Brady Campaign to Prevent Gun Violence v. Salazar*, 612 F. Supp. 2d 1
(D.D.C. 2009) (Kollar-Kotelly, J.) .................................................................... 20

*Buffalo River Watershed Alliance v. USDA*, 2014 WL 6837005
(E.D. Ark. Dec. 2, 2014) ..................................................................................... 30

*Calloway v. Harvey*, 590 F. Supp. 2d 29 (D.D.C. 2008) ........................................... 22

*Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402 (1971) ................................. 11

*Comtys. Against Runway Expansion v. FAA*, 355 F.3d 678 (D.C. Cir. 2004) ............ 29

*Defenders of Wildlife v. Jackson*, 791 F. Supp. 2d 96 (D.D.C. 2011) ...................... 35

*Delaware Riverkeeper Network v. FERC*, 753 F.3d 1304 (D.C. Cir. 2014) ......... 20, 23, 27

*Detroit Int'l Bridge v. Gov't of Canada*, 133 F. Supp. 3d 70 (D.D.C. 2015) ................. 6

*Envtl. Integrity Proj. v. EPA*, 425 F.3d 992 (D.C. Cir. 2005) .............................. 16, 17

*Esch v. Yeutter*, 876 F.2d 976 (D.C. Cir. 1989) ..................................................... 6, 22

*Friends of the Earth v. Laidlaw Envtl. Servs.*, 528 U.S. 167 (2000) ........................ 12

*Fund for Animals v. Norton*, 281 F. Supp. 2d 209 (D.D.C. 2003) ............................ 18

*Georgetown Univ. v. Bowen*, 821 F.2d 750 (D.C. Cir. 1987) .............................. 35, 36

*Grand Canyon Trust v. FAA*, 290 F.3d 339 (D.C. Cir. 2002) ........................... 20, 23, 24

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) ........................................... 12

*Haw. Longline Ass'n v. NMFS*, 288 F. Supp. 2d 7
(D.D.C. 2003) (Kollar-Kotelly, J.) ............................................................ 32, 35, 38

*Heartwood, Inc. v. USFS*, 230 F.3d 947 (7th Cir. 2000) ..................................... 11, 31

*Heartwood, Inc. v. USFS,* 73 F. Supp. 2d 962 (S.D. Ill. 1999) ................................. 31

*Humane Soc'y of U.S. v. Johanns*, 520 F. Supp. 2d 8
(D.D.C. 2007) (Kollar-Kotelly, J.) ............................................................... 23, 32

*Hunt v. Wash. State Apple Growers Adver. Comm'n*, 432 U.S. 333 (1977) ................................ 12

*In re: Daley Farms*, No. A19-0207 (Minn. Ct. App. Oct. 14, 2019) ............................................ 25

*Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*,
407 F.3d 1250 (D.C. Cir. 2005) ...................................................................................... 17

*Klamath-Siskiyou Wildlands Ctr. v. BLM*, 387 F.3d 989 (9th Cir. 2004) .................................. 23

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014) ............................ 14

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) .................................................................. 14

*Marsh v. Or. Natural Res. Council*, 490 U.S. 360 (1980) .......................................................... 11

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ......................................................................................... 11, 19, 20

*Nat'l Parks Conservation Ass'n v. Jewell*, 62 F. Supp. 3d 7 (D.D.C. 2014) ............... 3, 33, 34, 35

*Ne. Md. Waste Disposal Auth. v. EPA*, 358 F.3d 936 (D.C. Cir. 2004) .................................... 16

*Reed v. Salazar*, 744 F. Supp. 2d 98 (D.D.C. 2010) (Kollar-Kotelly, J.) ................................. 11

*Shell Oil Co. v. EPA*, 950 F.2d 741 (D.C. Cir. 1991) ............................................................... 17

*Sierra Club v. Bosworth*, 2005 WL 2281074 (E.D. Cal. Sept. 16, 2005) ..................................... 6

*Sierra Club v. Bosworth*, 510 F.3d 1016 (9th Cir. 2007) ................................................... passim

*Stand Up for California! v. Dep't of Interior*, 204 F. Supp. 3d 212 (D.D.C. 2016) .................... 18

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
255 F. Supp. 3d 101 (D.D.C. 2017) .......................................................................... 23, 29

*United Keetoowah Band of Cherokee Indians in Okla. v. FCC*,
933 F.3d 728 (D.C. Cir. 2019) ............................................................................... passim

*United Techs. Corp. v. Dep't of Def.*, 601 F.3d 557 (D.C. Cir. 2010) ........................................ 12

*Utah Envtl. Cong. v. Bosworth*, 443 F.3d 732 (10th Cir. 2006) .............................................. 5, 21

*Vanda Pharmaceuticals, Inc. v. FDA*, 2019 WL 1198703 (D.D.C. Mar. 14, 2019) ................... 37

*Waterkeeper Alliance v. EPA*, 853 F.3d 527 (D.C. Cir. 2017) ......................................... 8, 25, 37

*WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41 (D.D.C. 2019) ..................................... 23, 26

**STATUTES**

42 U.S.C. § 4321 .................................................................................................................. 3, 14

42 U.S.C. § 4332 ....................................................................................................... 3, 20

42 U.S.C. § 4342 ........................................................................................................... 3

42 U.S.C. § 4344 ........................................................................................................... 3

5 U.S.C. § 553 .......................................................................................................... 16, 17

5 U.S.C. § 702 ............................................................................................................. 11

5 U.S.C. § 706 ............................................................................................................. 11

## OTHER AUTHORITIES

Carrie Hribar, Nat'l Ass'n of Local Bds. of Health, *Understanding Concentrated
    Animal Feeding Operations and Their Impact on Communities* (2010).................... 7, 8, 24, 27

EPA, *Inventory of U.S. Greenhouse Gas Emissions and Sinks: 1990-2017*,
    EPA 430-R-19-001 (2019) ........................................................................... 26

Gollehon et al., *Confined Animal Production and Manure Nutrients*,
    USDA Econ. Res. Serv., Agric. Info. Bulletin 771 (2001) ....................................... 27

Gov't Accountability Office, *Concentrated Animal Feeding Operations:
    EPA Needs More Information and a Clearly Defined Strategy to Protect Air and
    Water Quality from Pollutants of Concern*, Rep. GAO-89-944 (Sept. 2008)........................... 6

Jan. 12, 2017 EPA External Civil Rights Compliance Office Letter of Concern to
    N.C. Dep't of Envtl. Quality ........................................................................ 29

Small Business Ass'n Office of Inspector Gen., *Evaluation of SBA 7(A) Loans
    Made to Poultry Farmers*, Rep. No. 18-13 (Mar. 6, 2018) ....................................... 7

## RULES

Fed. R. Civ. P. 56 ........................................................................................................ 11

## REGULATIONS

40 C.F.R. § 122.23 ........................................................................................................ 6

40 C.F.R. § 1500.1 ........................................................................................................ 3

40 C.F.R. § 1501.4 ........................................................................................................ 4

40 C.F.R. § 1507.28 ...................................................................................................... 5

40 C.F.R. § 1507.3 .............................................................................................. 4, 5, 15

40 C.F.R. § 1508.13 ................................................................................................... 4

40 C.F.R. § 1508.14 ................................................................................................... 5

40 C.F.R. § 1508.27 ............................................................................................. 28, 30

40 C.F.R. § 1508.4 ............................................................................................. passim

40 C.F.R. § 1508.7 ............................................................................................... 5, 24

40 C.F.R. § 1508.8 ............................................................................................... 5, 27

40 C.F.R. § 1508.9 ..................................................................................................... 4

53 Fed. Reg. 36237 (Sept. 19, 1988) ...................................................................... 35

59 Fed. Reg. 7629 (Feb. 11, 1994) .......................................................................... 29

68 Fed. Reg. 7176 (Feb. 12, 2003) .......................................................................... 26

7 C.F.R. § 799.34 ............................................................................................... 21, 22

7 C.F.R. § 799.41 ................................................................................................. 9, 16

74 Fed. Reg. 66517 (Dec. 15, 2009) ........................................................................ 25

76 Fed. Reg. 65431 (Oct. 21, 2011) ......................................................................... 26

Council on Env'l Quality, *Memorandum for Heads of Federal Dep'ts and Agencies: Establishing, Applying & Revising Categorical Exclusions under the National Environmental Policy Act*, 75 Fed. Reg. 75628 (Dec. 6, 2010) ................ 4, 15, 21, 22

## MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION FOR REMAND WITHOUT VACATUR AND IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION.

This case challenges Defendant Farm Service Agency's ("FSA") decision to take away one of the few tools rural communities have left to protect themselves from pollution caused by the rapid influx of industrial animal production factories. Plaintiffs are organizations representing rural communities who rely on the National Environmental Policy Act ("NEPA") to learn about the risks posed by industry coming into their community, and to gain a meaningful way to participate in that decision making.

Plaintiffs have argued—and Defendants have agreed—that the last-minute categorical exclusion of federal actions to finance medium concentrated animal feeding operations under NEPA (the "medium CAFO CatEx") is unjustified. Now, however, Defendants seek an indefinite remand without vacatur, leaving the unlawful rule in place while the agency manufactures a *post hoc* rationalization to justify the exclusion. But FSA excluded actions that substantively *cannot* be categorically excluded under NEPA, because the actions "individually or cumulatively have a significant effect on the human environment." 40 C.F.R. § 1508.4. Anything short of vacatur will seriously frustrate NEPA's commitment to environmental stewardship and transparency in agency decision making, and compromise opportunities for rural communities to meaningfully participate in that any form of NEPA review.

Prior to the CatEx, FSA at least conducted environmental assessments ("EAs") before providing federal financial assistance to nearly all medium CAFOs.[1] Medium CAFOs are

---

[1] FSA's prior regulations generally required EAs for CAFOs at least half the size of a large CAFO, a size range that encompasses most of the medium CAFO size category. Before the CatEx, therefore, FSA conducted EAs before providing assistance to most medium CAFOs.

businesses that employ "industrial animal production, a model characterized in part by specialized operations designed for a high rate of production and large numbers of animals confined at high density." Decl. of Robert Martin ¶ 6. This industrial model of animal production results in the routine accumulation and disposal of excess untreated animal waste, which pollutes the air, surface water, and groundwater resources on which rural communities rely. In short, FSA excluded from environmental review an entire category of industrial operations whose waste byproducts have known and well-established risks to human health and the environment.

FSA acknowledges that it failed to give a reasoned basis for the exclusion, failing to even consider the environmental impacts of medium CAFOs, much less substantiate that they can be excluded from review because they have no effect on the environment. *See* Vol'y Remand Mot. at 11-12 (Dkt. No. 31). FSA further violated NEPA and the Administrative Procedure Act ("APA") by failing to give public notice and accept comment on the CatEx and by basing the exclusion on the purported burden of NEPA review to industry, rather than on environmental effects, which is inconsistent with NEPA. The record is clear, and these facts are not in dispute.

More importantly, FSA's motion to allow a rule it acknowledges as deficient to stand is particularly unjust where the facts known about medium CAFOs so clearly establish the potential for significant effect on the human environment. Rural communities are increasingly forced to bear the burden of an industrial model of animal agriculture, which profits from activities that degrade their clean air and water. The profit does not go back into the community. Rather, it goes to corporations hundreds or thousands of miles away. Without environmental review of the actions exempted by the medium CAFO CatEx, rural communities have lost critical tools to inform them about how their taxpayer dollars are being used and have no way to participate in decision making around whether new or expanded CAFOs should come into their community.

Moreover, FSA loses the ability to assess the potential impacts on rural America before giving loan assistance to a CAFO, particularly where medium CAFOs are rapidly expanding, resulting in crises over contaminated air and drinking water.

Accordingly, Plaintiffs oppose Defendants' motion for voluntary remand without vacatur. Because the rule is irredeemable, the Court should grant Plaintiffs summary judgment. An order on summary judgment will allow the Court to vacate the CatEx. *See Nat'l Parks Conservation Ass'n v. Jewell*, 62 F. Supp. 3d 7, 14 (D.D.C. 2014) (distinguishing itself from cases holding they lacked vacatur authority because they "had not made a determination of the merits"). This is the only way to ensure FSA acts lawfully and to protect Plaintiffs' and rural communities' rights.

## STATEMENT OF THE CASE.

### I.  LEGAL BACKGROUND ON NEPA AND CATEGORICAL EXCLUSIONS.

NEPA, 42 U.S.C. §§ 4321-47, is the "basic national charter for protection of the environment." 40 C.F.R. § 1500.1. It is designed to "insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken." *Id*. § 1500.1(b)-(c). NEPA's purpose is to "prevent or eliminate damage to the environment." 42 U.S.C. § 4321. To accomplish these ends, NEPA requires that all federal agencies prepare a detailed statement, known as an environmental impact statement ("EIS"), for all "major federal actions significantly affecting the quality of the human environment  . . ." *Id.* § 4332(2)(C).

Congress established the Council on Environmental Quality ("CEQ") to oversee implementation of NEPA across the entire federal government. *United Keetoowah Band of Cherokee Indians in Okla. v. FCC*, 933 F.3d 728, 735 (D.C. Cir. 2019) (citing 42 U.S.C. §§ 4342, 4344). Under CEQ's regulations, federal agencies may prepare an environmental assessment ("EA") to determine whether a proposed action may have a "significant" effect on

the environment. 40 C.F.R. § 1501.4. If the agency determines that the project will have no

significant environmental effects, the agency may then issue a finding of no significant impact,

rather than prepare an EIS for the project. *Id.* §§ 1508.9(a)(1), .13.

CEQ regulations also provide that in some situations, neither an EA nor an EIS is

required, and federal agencies may instead create a categorical exclusion from NEPA analysis.

*Id.* § 1508.4. The regulations define categorical exclusions as follows:

> "Categorical exclusion" means a category of actions *which do not individually or
> cumulatively have a significant effect on the human environment* and *which have
> been found to have no such effect* in procedures adopted by a Federal agency in
> implementation of these regulations (§ 1507.3) and for which, therefore, neither an
> environmental assessment nor an environmental impact statement is required. . . .
> Any procedures under this section shall provide for extraordinary circumstances in
> which a normally excluded action may have a significant environmental effect.

*Id.* § 1508.4 (emphasis added); *see also* CEQ, *Memorandum for Heads of Federal Dep'ts and*

*Agencies: Establishing, Applying & Revising Categorical Exclusions under the National*

*Environmental Policy Act*, 75 Fed. Reg. 75628 (Dec. 6, 2010) ("CEQ Categorical Exclusion

Memo") (guidance for agencies on how to establish, apply, and revise categorical exclusions in

accordance with NEPA).[2]

For an agency to create a CatEx, an agency must "determine whether a proposed activity

is one that, on the basis of past experience, normally does not require further environmental

review"—namely, whether the activity does "not individually or cumulatively have a significant

effect on the human environment." CEQ Categorical Exclusion Memo, at 75631. CEQ

regulations define several words appearing in the definition of "categorical exclusion" to guide

the agency's determination. Cumulative effects are the "results from the incremental impact of

---

[2] FSA relied on the CEQ Categorical Exclusion Memo "to establish new categorical exclusions"
in the NEPA Final Rule. Fuller Decl. ¶ 6 (Dkt. No. 31-1).

the action" on the environment "when added to other past, present, and reasonably foreseeable

future actions." 40 C.F.R. § 1508.7; *see also id.* § 1508.8 (defining the term "effects" to be

interchangeable with "impacts" and to include direct and indirect effects). The "human

environment" includes "the natural and physical environment and the relationship of the people

with that environment." *Id.* § 1508.14. "Significantly," with reference to effects on the human

environment, "requires considerations of both context and intensity." *Id.* § 1507.28 (further

defining "context" as the relevant "setting[s] of the proposed action" and "intensity" as "the

severity of the impact"). When creating a CatEx, the agency must "substantiate," in an

administrative record, its determination that the category of actions do not individually or

cumulatively have a significant effect on the environment. CEQ Categorical Exclusion Memo,

75 Fed. Reg. at 75633. The agency must also give "the public notice and opportunity to

comment" on proposed categorical exclusions. *Id.* at 75634. In other words, to properly create a

categorical exclusion, the agency must do "the heavy lifting" to determine the actions do not

individually or cumulatively have a significant effect on the human environment. *Utah Envtl.*

*Cong. v. Bosworth*, 443 F.3d 732, 750 (10th Cir. 2006).

     The regulations further require that agencies adopt procedures to implement NEPA,

including for creating and employing categorical exclusions. 40 C.F.R. § 1507.3(b)(2)(ii).

## II.    FACTUAL BACKGROUND.

### A.  Medium CAFOs are Industrial Operations.

     CAFOs are industrial operations with industrial-scale impacts. As opposed to farms,

which are often diverse and interdependent in their production models, the CAFO industrial

model is "designed for a high rate of production." Martin Decl. ¶ 6.[3] CAFOs are often specialized and standardized based on corporate-controlled operating procedures. *See id.* They confine large numbers of animals at high density. *Id.* CAFO operations treat the confined animals as raw material for the production of either meat, eggs, or milk. The byproduct of those raw materials is the "routine accumulation of large volumes of animal waste," which is usually stored onsite and disposed of on nearby land, typically without treatment and "at rates far exceeding the capacity of nearby farmland to absorb it." *Id.* ¶ 7.

FSA's CatEx rule categorizes CAFOs according to EPA's size thresholds. A medium CAFO can confine up to 699 dairy cows, 2,499 hogs weighing 55 pounds or more, and tens or hundreds of thousands of smaller animals, like turkeys or chickens. 40 C.F.R. § 122.23(b)(6) (referenced at AR 1609). The CAFO production model means that a single medium dairy or hog medium CAFO, for example, can create approximately the same amount of waste as all 24,000 residents of Lake Tahoe, California. *See* Gov't Accountability Office, *Concentrated Animal Feeding Operations: EPA Needs More Information and a Clearly Defined Strategy to Protect Air and Water Quality from Pollutants of Concern*, Rep. GAO-89-944 at 18 (Sept. 2008), *at* ("GAO 2008 Report").[4] The major difference between the two is that the animal waste, unlike human sanitary waste, is not treated before disposal. *See* Carrie Hribar, Nat'l Ass'n of Local Bds.

---

[3] The Court may consider this evidence to assess whether the agency considered all the relevant factors. *Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989); *Sierra Club v. Bosworth*, 2005 WL 2281074, *7 (E.D. Cal. Sept. 16, 2005) (accepting expert declarations in facial challenge to a categorical exclusion "to assist the Court in determining whether the [agency] considered all relevant factors and to assist in explaining complex scientific issues"), *rev'd other grounds*.

[4] *Available at* https://www.gao.gov/new.items/d08944.pdf. The Court may take judicial notice of "materials published in the Federal Register," as well as "public records and government documents available from reliable sources." *Detroit Int'l Bridge v. Gov't of Canada*, 133 F. Supp. 3d 70, 84-85 (D.D.C. 2015) (citing cases).

of Health, *Understanding Concentrated Animal Feeding Operations and Their Impact on Communities*, at 3 (2010) ("NALBOH Report").[5]

Contrary to Defendants' self-serving depiction that medium CAFOs are "all" family farms, most do not satisfy any commonsense understanding of that term. *See, e.g.*, Peterson Second Decl. ¶ 7 (Dkt. No. 31-2). Most medium CAFOs are part of a "vertically integrated" structure, where a large corporation owns the animals throughout their lives, and controls nearly every aspect of the production process. *See* AR 10555 (describing "typical vertically integrated broiler (meat chicken) company"); AR 9780-9941 (spreadsheet with FSA guaranteed loans to hundreds of operations associated with corporate integrators in 2010-11).

In a vertically integrated structure, the CAFO operators contract with the corporate integrators to raise animals per the companies' specifications—down to the amount of light the animals get during the day. AR 10555-57. In fact, the Small Business Administration Office of Inspector General ("SBA OIG") found that in the poultry industry, integrators "exercise such comprehensive control" over contracted CAFO operators that SBA's loan assistance to the CAFOs is "inconsistent with its stated mission to assist small business concerns." SBA OIG, *Evaluation of SBA 7(A) Loans Made to Poultry Farmers*, Rep. No. 18-13 (Mar. 6, 2018) ("SBA OIG Report").[6] FSA officials are fully aware that CAFOs are part of a larger corporate integrated model. *See*, *e.g.*, Decl. of Margo Tucker ¶ 7 & Ex. A (noting FSA official's concern that Perdue "fronts the cost of building a new turkey facility," leaving the owner to request funding they need to "pay Perdue back"). CAFOs should not be confused with family farms, where farmers own the animals they raise and do not use industrial confinement production methods.

---

[5] *Available at* https://www.cdc.gov/nceh/ehs/docs/understanding_cafos_nalboh.pdf.

[6] *Available at* https://www.sba.gov/sites/default/files/oig/SBA-OIG-Report-18-13.pdf.

As explained in more detail in Argument Section I.C below, the industrial CAFO model creates serious risks to public health and the environment. *See also* Martin Decl. ¶ 7. This is primarily because CAFOs must store the massive amount of untreated animal urine and feces they produce in giant pits or lagoons (for liquid waste) or piles (for dry waste). AR 10488. Collected together, stored CAFO waste emits dangerous gases, which are not present on farms where animals are land-based and waste is directly deposited by the animal onto pasture. *See Waterkeeper Alliance v. EPA*, 853 F.3d 527, 536 (D.C. Cir. 2017); Martin Decl. ¶¶ 10, 13-14. Stored waste also can seep into groundwater or runoff into surface water. *See, e.g.*, AR 10571-73 (paper discussing poultry litter polluting water resources); Martin Decl. ¶¶ 13-14, 28, 30-32.

The most common way medium CAFOs then dispose the stored waste is through land application. NALBOH Report, at 2. Because the animals are fed industrial feed additives and the waste is untreated, the land-applied waste includes high levels of pathogens and bacteria, nitrogen, phosphorus, pharmaceuticals, and heavy metals. *See* Martin Decl. ¶ 28. One method of application is the pumping of liquefied manure into a sprayer that shoots the waste into the air over the land. NALBOH Report, at 3. Land application of industrial-scale waste can "overwhelm the absorptive capacity of the soil, and either run off [into surface water] or [leach] into the groundwater." *Id*. Moreover, medium CAFOs are often built in close proximity, clustering near slaughterhouses and processing plants. *See* NALBOH Report, at 3. The clustering of CAFOs in a geographic area intensifies the facilities' effects on certain communities and watersheds.

### III.    PROCEDURAL HISTORY OF THE MEDIUM CAFO CATEX.

#### A.    FSA's Establishment of the Medium CAFO CatEx in the Final NEPA Implementation Rule.

Until FSA finalized the challenged rule, its regulations required the agency to conduct at least an EA before providing financial assistance for most facilities now classified as medium

CAFOs. AR 19 (7 C.F.R. § 1940.311(c)(8)). In September 2014, FSA issued a proposed rule to update its implementation of NEPA. The Proposed Rule explained that FSA would use a new document, called an Environmental Screening Worksheet ("ESW"), which would serve as a tool for applying a categorical exclusion. AR 1499. In the Proposed Rule, FSA "proposed additions to the existing list of categorical exclusions," AR 1497, but did *not* include medium CAFO actions in the new list of categorical exclusions. Instead, the agency specifically proposed to continue requiring an EA for "construction or expansion of a CAFO" (without limitation to the CAFO size), and for the "[r]efinancing of a newly constructed CAFO, including medium CAFOs. . . ." AR 1515 (proposed 7 C.F.R. § 799.41(9)-(10) (Sept. 3, 2014)).

During the public comment period on the Proposed Rule, industry commenters asked FSA not to require EAs for medium CAFOs because it "appears to increase the regulatory burden" and "would be an onerous impediment to obtaining financing . . . ." *See, e.g.*, AR 1471 (FCS Financial comments). The Missouri Soybean Association, Missouri State FSA Office, and twelve individuals in Missouri also all commented, identically, that requiring an EA for medium CAFOs would be more restrictive than state and EPA regulatory requirements. *See, e.g.*, AR 1439, 1444. Even though there was no notice that FSA might decrease NEPA review for medium CAFOs, the National Sustainable Agriculture Coalition, representing Plaintiffs Dakota Rural Action, Institute for Agriculture and Trade Policy, and other sustainable family farming non-profits, submitted a comment asking FSA to require preparation of EAs for even more funding actions than those in the Proposed Rule. AR 1486-89 (calling for EAs for actions on loan applications for CAFOs "located in any type of floodplain," among others).

FSA published the Final Rule on August 3, 2016. The agency left most of the proposal intact, but—for the first time during the rulemaking process—changed the nationally applicable

9

NEPA review requirements for medium CAFOs. Its only direct explanation of how it would treat medium CAFOs came in response to the industry comment that the Proposed Rule "provisions for medium CAFOs would be an onerous impediment to obtaining financing." AR 1610. FSA stated that "EAs will only be required for large CAFOs; ESW review will be completed for small and medium CAFOs if there are no extraordinary circumstances involved in the proposed action." *Id*. FSA provided no explanation of the CatEx in the Final Rule.

### B.  Farm Service Agency's Procedural Maneuvering in This Case.

In a July 31, 2019 Joint Status Report, Defendants stated, "FSA is preparing a final rule that will rescind part of the NEPA Rule that Plaintiffs challenge in this case, *i.e.*, the medium CAFO categorical exclusion," and "Defendants accordingly intend to file a motion, no later than August 30, 2019, to hold this case in abeyance until FSA publishes the final rule or until January 31, 2020, whichever is earlier." Joint Status Report ¶ 9 (Dkt. No. 27); *see also* Peterson Decl. ¶¶ 4-6 (Dkt. No. 27-1) (FSA official describing agency's plan to render the medium CAFO provisions of the Final NEPA Rule "obsolete").

On August 29, the evening before the abeyance motion deadline, Defendants told Plaintiffs that FSA was reversing course and would instead file a motion for indefinite voluntary remand without vacatur. Defendants then sought leave for an extension to file that motion. *See* Joint Status Report ¶ 8(h)-(i) (Dkt. No. 29). Defendants filed that motion on September 19, 2019. (Dkt. No. 31.) Instead of rescinding the CatEx, as originally planned, Defendants now propose remand without vacatur because FSA asserts it expects to provide a *post hoc* explanation for the exclusion. *See* Emails from Defs.' Counsel (Dkt. No. 29-3); Fuller Decl. ¶ 8 (Dkt. No. 31-1) (FSA official stating she expects FSA to "provide a justification" for the CatEx on remand).

# IV.    SUMMARY JUDGMENT STANDARD AND STANDARD OF REVIEW.

Plaintiffs move for summary judgment on review of FSA's actions under the APA. 5

U.S.C. §§ 702, 706. Resolution is appropriate on summary judgment because review of

administrative actions is based on the administrative record,[7] leaving no genuine dispute of

material facts. *See* Fed. R. Civ. P. 56; *see also Citizens to Pres. Overton Park v. Volpe*, 401 U.S.

402, 419 (1971). Under the APA, the Court must hold unlawful and set aside FSA's actions that

are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ." 5

U.S.C. § 706(2). *See Reed v. Salazar*, 744 F. Supp. 2d 98, 104 (D.D.C. 2010) (Kollar-Kotelly, J.)

("Agencies must comply with the procedural requirements of NEPA, and the decision to forego

production of an EIS or EA in favor of a categorical exclusion is subject to" arbitrary and

capricious review); *see also Heartwood, Inc. v. USFS*, 230 F.3d 947, 953 (7th Cir. 2000)

(applying "arbitrary and capricious" standard of review to facial attack on categorical exclusion).

Under arbitrary and capricious review, courts must be satisfied that the agency

"examine[d] the relevant data and [has] articulate[d] a satisfactory explanation for its action

including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle*

*Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("*State*

*Farm*") (citation omitted). In the context of NEPA claims, courts must ensure that the agency has

taken a "hard look" at the environmental consequences of the action by reviewing the record and

assessing whether the agency made a reasoned decision based on the relevant factors. *Marsh v.*

*Or. Natural Res. Council*, 490 U.S. 360, 373-74 (1980). The Court "owe[s] no deference" to

FSA's interpretations of NEPA, a statute primarily administered by CEQ. *United Keetoowah*,

---

[7] FSA certified the list of the contents of the Administrative Record on September 30, 2019.

933 F.3d at 738. Moreover, courts may not defer to an agency's "conclusory or unsupported suppositions." *United Techs. Corp. v. Dep't of Def.*, 601 F.3d 557, 562 (D.C. Cir. 2010).

## V.     PLAINTIFFS' INTERESTS IN THE MEDIUM CAFO CATEX.

Plaintiffs are non-profit organizations dedicated to protecting communities, the environment, and animals from the suite of harms from industrial animal agriculture. Nearly all of the Plaintiffs are membership organizations whose members live in communities suffering from CAFO proliferation and these CAFOs' associated air and water pollution, disease threats, and harms to rural quality of life.[8] *See Friends of the Earth v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 180-84 (2000) (describing individual standing); *Hunt v. Wash. State Apple Growers Adver. Comm'n*, 432 U.S. 333, 343 (1977) (explaining associational standing).

Many of Plaintiffs' members are farmers and other rural residents who live adjacent to or in close vicinity of CAFOs, and medium sized CAFOs in particular. *See* Decl. of Lisa Bough ¶ 2 (half a mile from CAFO); Decl. of Emma Schmit ¶ 4 (county has 77 medium sized CAFOs); Decl. of Dane Shumacher ¶ 7 (downstream from chicken CAFOs).[9] The CatEx removed FSA actions for medium CAFOs from NEPA environmental review, and in doing so, eliminated the

---

[8] *See* Decl. of Frank James ¶¶ 3-10 (Dakota Rural Action); Decl. of Tom Frantz ¶¶ 2-4 (Association of Irritated Residents); Decl. of Mark Walden ¶¶ 1-4 (Animal Legal Defense Fund); Tucker Decl. ¶¶ 1-5 (Citizens Action Council of Indiana); Decl. of Patty Lovera ¶¶ 1-4 (Food & Water Watch); Decl of Kathy Anderson ¶¶ 2-10 (Guardians of the Grand Lake St. Marys); Decl. of Adam Mason ¶¶ 1-3 (Iowa Citizens for Community Improvement); Decl. of Jessie Green ¶¶ 1-4 (White River Waterkeeper). The one non-membership plaintiff organization, Minnesota-based Institute for Agriculture and Trade Policy, has had to divert its resources to combat the uninhibited and below-the-radar expansion of medium CAFOs across Minnesota specifically and the United States generally, which frustrates its mission of ensuring a fair and sustainable food, farm, and trade system. *See* Decl. of Ben Lilliston; *see Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 & nn. 19-20 (1982) (finding standing from injury to organization resources).

[9] *See also* Frantz Decl. ¶¶ 3-9; Decl. of Cynthia Parke ¶ 4; Anderson Decl. 3-10.

chance that FSA's environmental analysis would require mitigation of adverse impacts or lead FSA to choose a less harmful alternative to the CAFO—two considerations included in an EA.

The CatEx also eliminated these members' ability to use the public notice and comment period that would accompany NEPA review to know about federal actions and meaningfully participate in what happens in their communities. This process is critical given the known harms from industrial animal production, particularly where there is a concentration of operations within a community. Such harms include exposure to unbearable stench, flies, and animal body parts, *see* Martin Decl. ¶¶ 13, 21, 25-26; increased risk of antimicrobial resistant bacteria entering their communities and infecting them or their animals, *id.* ¶¶ 15-16; increased risk of contaminated drinking water, *id.* ¶¶ 27–34; increased risk of asthma and other harms from air pollution, *id.* ¶¶ 22, 25; loud noises, deteriorating road conditions, and exhaust accompanying increased traffic, *see id.* ¶¶ 13, 25; lost recreational opportunities, like hiking and bicycling in areas impacted by odor and air pollution, *id.* ¶¶ 26, and swimming, boating, and kayaking in lakes, rivers, and creeks affected by water pollution, *id.* ¶¶ 28-29, 35.

Plaintiffs and their members also frequently participate in state and federal regulatory processes, such as commenting on proposed rules and CAFO permits to try and stop new and expanding operations in their communities. *See, e.g.*, Frantz Decl. ¶ 8; Parke Decl. ¶ 13; Walden Decl. ¶ 8; Lilliston Decl. ¶ 11; Anderson ¶ 13. FSA's promulgation of the CatEx, without providing notice and opportunity to comment in its Proposed Rule, harmed Plaintiffs' procedural rights. *See, e.g.*, Walden ¶ 13 (explaining how FSA's failures to follow proper rulemaking procedures harmed ALDF and its members); Parke Decl. ¶ 16 (ALDF member explaining FSA "denied me the ability to participate in the government").

The CatEx further violates Plaintiffs' procedural rights by categorically eliminating a review process that formerly provided notice and an opportunity to comment on numerous individual FSA actions to finance medium CAFOs. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 573 n.7 (1992) (describing procedural rights to protect a concrete interest). Plaintiffs' members feel that this tool is one of the few they have remaining to protect their communities. *See*, *e.g.*, Anderson Decl. ¶¶ 31-32 ("I do not know how we can protect our water and our community without this information and the chance to comment on these projects."); Parke Decl. ¶¶ 13-15 ("Without access to information, it is impossible to participate in the governance of my community in a meaningful way.").

These procedural, aesthetic, and recreational injuries are traceable to FSA's unlawful promulgation of the Final Rule. *See, e.g.*, Parke Decl. ¶¶ 14-15 (explaining how CatEx "take[s] away [her] ability to organize with [her neighbors]" and "protect[] [her]self from . . . pollution"); Anderson ¶ 13 (explaining how CatEx prevents the Guardians from "educat[ing] the public about what is happening in our community"). A favorable decision from the Court and accompanying vacatur of the medium CAFO provisions of the challenged rule would redress these injuries by ensuring that FSA actions to support the creation or expansion of these facilities do not occur without notice to the affected community and adequate environmental review. This would protect Plaintiffs' abilities to represent their members in rulemaking proceedings. *See*, *e.g.*, Lovera Decl. ¶¶ 18-19; Green Decl. ¶ 18; Walden Decl. ¶¶ 12-13, Anderson ¶¶ 28, 32, 34-35.[10]

---

[10] Plaintiffs and their members' environmental and public health concerns are within the zone of interests protected by NEPA. *See, e.g.*, 42 U.S.C. § 4321 (declaring purpose of NEPA to "prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man"); *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129-32 (2014) (describing zone of interests test as "not especially demanding") (quotation omitted).

## ARGUMENT.

Remand without vacatur is appropriate only where the agency action has reparable flaws *and* when the consequences of vacating the action would be disruptive while the agency fixes the rule. In the present case, it is undisputed that FSA violated NEPA and APA in its failure provide for notice and comment and to substantiate the CatEx. Moreover, as Plaintiffs establish below, medium CAFO actions cumulatively have significant effects on the human environment and, therefore, cannot be categorically excluded. Vacatur is not a disruptive remedy because it will simply return to the prior process that the agency and regulated entities had long followed to comply with NEPA; to the contrary, indefinite remand without vacatur would be disruptive, causing uncertainty and prejudicing Plaintiffs. Because NEPA's requirements to establish a CatEx cannot possibly be satisfied here, the only appropriate remedy is to vacate and enjoin FSA's use of the CatEx.

## I.   FSA'S CREATION OF THE MEDIUM CAFO CATEX WAS ARBITRARY AND CAPRICIOUS AND NOT IN ACCORDANCE WITH LAW.

### A.   FSA Violated NEPA and APA Procedural Requirements in Issuing The CatEx.

The D.C. Circuit recently explained that federal agencies may establish categorical exclusions for their actions only with CEQ approval "*and by following a series of mandated procedures.*" *United Keetoowah*, 933 F.3d at 735 (emphasis added) (citing 40 C.F.R. § 1508.4 & CEQ Categorical Exclusion Memo). Both CEQ's regulations and its Categorical Exclusion Memo lay out mandated procedures for establishing categorical exclusions. *See id.* at 737. The plainest procedural requirement is that an agency must give notice and solicit public comment on categorical exclusions that it intends to establish. *Id.* ("Categorical exclusions go through notice and comment"); 40 C.F.R. § 1507.3 (regulations requiring notice and comment for categorical

exclusions); CEQ Categorical Exclusion Memo, 75 Fed. Reg. at 75634-35 (including Federal Register notice and public comment period as steps within "an agency's process for establishing a new or revised categorical exclusion")

In addition, when an agency promulgates a legislative rule, the APA requires it to give the public fair notice and the ability to submit comments. *See* 5 U.S.C. § 553(b). Fair notice requires that a final rule be a logical outgrowth of its proposed rule, meaning that interested parties "should have anticipated that the change was possible, and thus reasonably should have filed their comments on the subject during the notice-and-comment period." *Ne. Md. Waste Disposal Auth. v. EPA*, 358 F.3d 936, 952 (D.C. Cir. 2004). A final rule is not a logical outgrowth "where interested parties would have had to divine [the agency's] unspoken thoughts, because the final rule was surprisingly distant from the Agency's proposal." *Envtl. Integrity Proj. v. EPA*, 425 F.3d 992, 996 (D.C. Cir. 2005) (quotations omitted) (explaining courts in this Circuit "refuse to allow agencies to use the rulemaking process to pull a surprise switcheroo").

Here, the Administrative Record demonstrates, and Defendants admit, FSA did not follow required procedures under NEPA and the APA.

### i. FSA did not give notice and accept public comment on the CatEx.

Defendants admit FSA added the CatEx into the Final NEPA Rule without first providing notice of it and accepting public comment. Mot. Vol'y Remand 3 (Dkt. No. 31) (noting Proposed Rule required EAs for medium CAFOs). During the public comment process, industry groups and an FSA office requested the agency remove the EA requirement. *Id.* at 4-5. Rather than give notice of a new categorical exclusion and reopen a public comment period, as NEPA regulations and the APA require, FSA created a "CatEx by implication" for medium CAFOs in the Final NEPA Rule. *Id.* at 1 n.1 (citing 7 C.F.R. § 799.41(a)). This "surprise switcheroo" deprived

Plaintiffs and the public of their procedural rights to notice and an opportunity to comment on

new categorical exclusions was, therefore, a violation of the APA and NEPA. *See* 5 U.S.C.

§ 553(b); *Envtl. Integrity Proj.*, 425 F.3d at 996; *United Keetoowah*, 933 F.3d at 737.[11]

That some industry actors asked FSA to completely reverse course during the comment

period does not show the agency satisfied the logical outgrowth doctrine. *See Int'l Union, United*

*Mine Workers of Am. v. Mine Safety & Health Admin.*, 407 F.3d 1250, 1259-61 (D.C. Cir. 2005)

(public comments during hearings do not create fair notice when "ambiguous comments and

weak signals from the agency" give the public "no such opportunity to anticipate and criticize"

the subsequent substance of the rules) (quoting *Shell Oil Co. v. EPA*, 950 F.2d 741, 751 (D.C.

Cir. 1991)). In this case, there were *no* "signals from the agency" in either the Proposed Rule or

the public comment period to give community groups like the Plaintiffs "to anticipate and

criticize" the categorical exclusion that appeared in the Final Rule.

### ii.  FSA cannot retroactively justify its unlawful rule.

An agency "must perform impacts analysis *prior* to promulgation of the [categorical

exclusion]." *Sierra Club v. Bosworth*, 510 F.3d 1016, 1027 (9th Cir. 2007) (emphasis added)

(vacating Forest Service's establishment of a categorical exclusion for timber clearing and

prescribed burns because, *inter alia*, "no cumulative impacts analysis was performed for the

[categorical exclusion] as a whole"); *id.* ("The determination that a categorical exclusion was the

---

[11] Remarkably, in their motion and supporting declaration, Defendants give no indication they
will provide notice and opportunity for comment on the Medium CAFO CatEx during remand.
*See* Vol'y Remand Mot. at 11-12 (Dkt. No. 31) (seeking remand so FSA can "engage in
additional examination, and if it concludes the evidence substantiates the current treatment of
Medium CAFO financial assistance, to provide that additional explanation"); Fuller Decl. ¶¶ 7-9
(Dkt. No. 31-1) (describing FSA's "additional review" of materials to add to the Administrative
Record and expectation it will provide "a justification for a categorical exclusion," and only
referring to a "rulemaking process with a proposed rule" if "a revision to the rule is necessary").

proper path to take should have taken place *after* scoping, reviewing the data call, and determining that the proposed actions did not have individually or cumulatively significant impacts.") (emphasis in original); *see also Fund for Animals v. Norton*, 281 F. Supp. 2d 209, 229-30 (D.D.C. 2003) (explaining that when an agency has already taken actions "before it had completed its NEPA review," a subsequent environmental review is a "*post-hoc* rationalization of a pre-determined action render[ing] the agency's conduct arbitrary and capricious"); *Stand Up for California! v. Dep't of Interior*, 204 F. Supp. 3d 212, 303-04 (D.D.C. 2016) (explaining unlawfulness of "predetermination").

There is no question that FSA failed to meet these requirements. Instead, Defendants telegraph they will pursue a *post hoc* rationale to substantiate the CatEx. Vol'y Remand Mot. 15 (Dkt. No. 31) (citing AR 318). That the agency is now proposing to conduct the required analysis with a pre-determined outcome in mind shows any result will be arbitrary and capricious. *See Bosworth*, 510 F.3d at 1027. This is especially true because FSA has taken and continues to take actions it intends to rationalize after-the-fact. *See Fund for Animals*, 281 F. Supp. 2d at 229-30.

Even if *post hoc* rationalization were a lawful approach, FSA cannot possibly rationalize the CatEx. Defendants suggest that on remand FSA will cherry-pick evidence in the record to support the CatEx. *See* Vol'y Remand Mot. 12 (Dkt. No. 31). But the only evidence that FSA selected concerns loans for "construction in previously disturbed areas." *Id.* (citing AR 332-35). That evidence does not cover the entire category of actions FSA has excluded; several applications of the CatEx show FSA giving funding assistance to construct or expand medium CAFOs in areas that were cropland or rolling pasture with no previous ground disturbance. *See, e.g.*, Mason Decl. ¶ 17 & Ex. A-H; Tucker Decl. ¶ 7 & Ex. A at 23-27.

Moreover, the Administrative Record contains *no* EAs for medium CAFOs, let alone EAs uniformly showing medium CAFOs have no significant effect on the human environment. The only record page that Defendants cite for the proposition that medium CAFOs "rarely" required an EA, *see* Vol'y Remand Mot. 15 (Dkt. No. 31) (citing AR 318), comes from an August 2013 document prepared before the Proposed Rule. *See* AR 308. Yet the Proposed Rule—which sought to add categorical exclusions and compile them all in one place, *see* AR 1497—actually required EAs for medium CAFOs. Thus, to the extent the record says anything about medium CAFOs, the EA requirement indicates FSA believed they have significant effects on the human environment. Indeed, under the prior rule, FSA actually treated some "medium CAFOs" with a Class II EA, which, as Defendants explain, concerns actions with "the potential for resulting in more varied and substantial environmental impacts." Vol'y Remand Mot. 8 (Dkt. No. 31).

## B. FSA Violated NEPA and the APA Because It Failed to Provide the Required Reasoned Basis for the CatEx.

To withstand judicial review, a categorical exclusion must have a reasoned basis. The APA requires an agency decision to establish a categorical exclusion to be based on relevant facts and to consider appropriate factors. NEPA requires agencies to "substantiate" a categorical exclusion by considering all relevant information. FSA has done neither here.

### i. FSA did not base the CatEx on relevant facts and failed to consider important factors.

FSA's promulgation of the Medium CAFO CatEx is arbitrary and capricious because it was not based on "a consideration of the relevant facts," the agency "failed to consider an important aspect" of the issues associated with its decision, and it "relied on factors which Congress has not intended it to consider." *State Farm,* 463 U.S. at 43.

For a categorical exclusion, the "relevant facts" are whether the covered agency actions "individually and cumulatively have a significant effect on the human environment." 40 C.F.R. § 1508.4; *see also United Keetoowah*, 933 F.3d at 737 (categorical exclusions include "impact findings"); *Delaware Riverkeeper Network v. FERC*, 753 F.3d 1304, 1319 (D.C. Cir. 2014) (quoting *Grand Canyon Trust v. FAA*, 290 F.3d 339, 345 (D.C. Cir. 2002)) (outlining the steps of what constitutes "a meaningful cumulative impact analysis"). Here, FSA acknowledges that it did not perform *any* environmental analysis for medium CAFOs. *See* Vol'y Remand Mot. 11-12 (Dkt. No. 31) (noting "the agency did not enumerate the size of the facilities for which past NEPA documents were considered"). FSA, therefore, did not base its decision on the relevant facts and also failed to consider an important aspect of the problem. *See State Farm*, 463 U.S. at 43; *Brady Campaign to Prevent Gun Violence v. Salazar*, 612 F. Supp. 2d 1, 17 (D.D.C. 2009) (Kollar-Kotelly, J.) (finding categorical exclusion arbitrary and capricious because defendants failed to consider the environmental impacts of the foreseeable consequences of the final rule).

Instead of basing the CatEx on a finding that medium CAFOs have no significant environmental impacts, FSA established the exclusion in response to industry comments complaining of regulatory burden. *See* AR 1610 (explaining FSA "revised the provisions to clarify that EAs will only be required for large CAFOs" in response to the industry comment that requiring EAs for medium CAFOs "would be an onerous impediment for obtaining financing for operations"); *see also* Vol'y Remand Mot. 5 (Dkt. No. 31) (describing industry concerns and FSA response). Encouraging industry growth is not a proper reason under NEPA for creating a categorical exclusion. *See* 42 U.S.C. § 4332 (requiring environmental review for "major Federal actions significantly affecting the human environment"); 40 C.F.R. § 1508.4. Thus, FSA relied

on "factors which Congress has not intended it to consider," which is yet another basis to

conclude the NEPA Rule was arbitrary and capricious. *State Farm*, 463 U.S. at 43.

### ii. FSA did not substantiate its creation of a new categorical exclusion.

As with the notice and comment deficiencies, Defendants admit FSA did not substantiate

the CatEx in accordance with NEPA regulatory requirements. The record bolsters this admission.

The CEQ Categorical Exclusion Memo details how an agency must substantiate

categorical exclusions in accordance with NEPA and its regulations: "For actions that do not

obviously lack significant environmental effects, agencies must gather sufficient information to

support establishing a new or revised categorical exclusion." 75 Fed. Reg. at 75633-34 (noting

substantiation includes, *inter alia*, "monitoring and/or otherwise evaluating the effects of

implemented actions that were analyzed in EAs" and "impact demonstration projects"). FSA

itself requires consideration of "all relevant information," including FSA and other agency

NEPA documents, results from demonstration or pilot projects, and analyses from professional

staff and other experts, before creating categorical exclusions. 7 C.F.R. § 799.34(a). FSA must

also "maintain an administrative record that includes supporting information and findings used in

establishing a categorical exclusion." *Id.* § 799.34(b)-(c); *see Utah Envtl. Cong.*, 443 F.3d at 750

(agency must first conduct "extensive environmental analysis and determine that any project

approved under a categorical exclusion would not produce a significant or cumulative effect on

the environment in the absence of extraordinary circumstances").

Defendants concede that FSA has not substantiated the CatEx: "The agency has

concluded that additional findings are required to substantiate [the] categorical exclusion for

Medium CAFOS." Vol'y Remand Mot. at 12 (Dkt. No. 31) (citing Fuller Declaration at ¶ 7); *see*

*also* Peterson Decl. ¶ 4 (Dkt. No. 27-1) ("FSA has concluded that additional analysis of FSA's NEPA Rule regarding CAFOs is needed . . .").

The Administrative Record supports Defendants' concession. FSA provided the supporting documentation to CEQ to substantiate the categorical exclusions prior to publication of the Proposed Rule. *See* AR 308-62 (Dkt. No. 31-6) ("Addition of New Categorical Exclusions" document, dated August 2013). According to the substantiation document, "the proposed rule adds *all* such actions that should have been CatExed in the FSA NEPA regulations." AR 313 (emphases added). But the Proposed Rule did not include medium CAFOs as a categorical exclusion. FSA's August 2013 Supporting Documentation, thus, did not substantiate a categorical exclusion for medium CAFOs. Nor did FSA subsequently provide any more supporting documents to CEQ to substantiate its categorical exclusions in the NEPA Rule. *See* Decl. of Cristina Stella Ex. 1 (Jun. 26, 2016 email from Nell Fuller of FSA to CEQ, noting that all of the substantiation for the categorical exclusions came from the proposed rule stage).[12]

The agency's failure to substantiate its establishment of the CatEx before promulgating it violated NEPA regulations. *See* CEQ Categorical Exclusion Memo, 75 Fed. Reg. at 75633; 7 C.F.R. § 799.34(b)-(c). As a result, according to FSA's own data, almost *ten thousand* loan actions that would have previously required an environmental assessment have since been improperly excluded from environmental review under NEPA, and counting. *See* Peterson Second Decl. ¶ 7 (Dkt. No. 31-2) (explaining that FSA processes nearly 3,000 medium CAFO loan applications per year).

---

[12] The Court may consider extra-record evidence, *inter alia*, when agency action is not adequately explained in the record before the court; when the agency failed to consider factors relevant to its final decision; and in cases arising under NEPA. *Calloway v. Harvey*, 590 F. Supp. 2d 29, 80 n.7 (D.D.C. 2008) (quoting *Esch*, 876 F.2d at 991).

**C.  The CatEx Unlawfully Excludes Federal Actions with Cumulatively
Significant Effects on the Human Environment.**

Had FSA taken a hard look at the impacts of medium CAFOs, it would have come to the

inescapable conclusion that they "individually and cumulatively have a significant effect on the

human environment" and, thus, no exclusion is or can be appropriate. 40 C.F.R. § 1508.4.

Cumulative effects are "the impact on the environment which results from the

incremental impact of the action when added to other past, present, and reasonably foreseeable

future actions . . . ." *Grand Canyon Trust*, 290 F.3d at 341 (citation omitted). "The most obvious

way [to show cumulative significance] is that the greater total magnitude of the environmental

effects . . . may demonstrate by itself that the environmental impact will be significant."

*Klamath-Siskiyou Wildlands Ctr. v. BLM*, 387 F.3d 989, 993-94 (9th Cir. 2004).

A wide range of impacts can become cumulatively significant. A "global cumulative

impacts analysis must be performed" to review the "effects on air quality," the "effects on soil

and water quality," and the "impacts on wildlife and wildlife habitat." *Bosworth*, 510 F.3d at

1029-30. Cases from this Circuit have also required analysis of: effects of greenhouse gas

emissions, *WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41, 76-77 (D.D.C. 2019); effects on

public health or safety, *Humane Soc'y of U.S. v. Johanns*, 520 F. Supp. 2d 8, 19 (D.D.C. 2007)

(Kollar-Kotelly, J.); the availability of water, *Delaware Riverkeeper Network v. FERC*, 753 F.3d

at 1318-20 (requiring review of whether "groundwater flow was disrupted"); "environmental-

justice" health and environmental effects on minority populations and low-income populations,

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 255 F. Supp. 3d 101, 136-40 (D.D.C.

2017); and effects on animals exploited by industry at focus of the federal action, *Am. Oceans

Campaign v. Daley*, 183 F. Supp. 2d 1, 20 (D.D.C. 2000). Medium CAFO impacts are plainly

cumulatively significant.

i. **FSA must consider all of its numerous medium CAFO funding actions and other CAFO construction actions.**

With the enormous number of CAFOs covered by the CatEx, the amounts of land acreage, water bodies, and communities affected by it render significant the cumulative effects of FSA's medium CAFO actions. *See Klamath-Siskiyou Wildlands Ctr.*, 387 F.3d at 993-94. According to FSA, it receives almost 3,000 loan applications for medium CAFOs each year. Peterson Second Decl. ¶¶ 7-8 (Dkt. No. 31-2). Data collected in FSA's internal review of all of the agency's guaranteed loans from calendar years 2010 and 2011 similarly show funding assistance for a huge number of CAFOs. AR 9768, 9774 (spreadsheet showing, *inter alia*, FSA guaranteed loans for over 650 CAFOs for "broiler" chickens that received a Class I EA).

Moreover, FSA documented that hundreds of the guaranteed loans from 2010 and 2011 were associated with integrators. *See* AR 9780-9941 (including, *inter alia*, 597 guaranteed loan applications with Tyson, 101 with Perdue, and 89 with Sanderson Farms as identified integrators); *see also* AR 9780 (specifically showing two FSA guaranteed loans of over $800,000 combined for a Class I EA facility that noted Tyson as the integrator). The cumulative effects of FSA's CAFO funding actions should, therefore, be considered with other production in integrators' sprawling networks. *See, e.g.*, AR 10581 (describing CAFO operations for multiple "stages" within vertical integration of pig industry). *See Grand Canyon Trust*, 290 F.3d at 341 (cumulative effects consider action in addition to "other past, present, and reasonably foreseeable future actions" undertaken by even non-Federal persons). And indeed, CAFOs contracting with the same integrator often exist in the geographic location, concentrating their cumulative effects. *See, e.g.*, Anderson Decl. ¶ 11 (describing "well over 100 medium-sized CAFOs" in watershed); NALBOH Report at 2-3. For the same reason, the cumulative impacts analysis must consider

24

other CAFO construction and expansion, regardless whether financed by FSA or associated with an integrator. *See* 40 C.F.R. § 1508.7.

> ### ii. Medium CAFOs produce a variety of significant and harmful effects on the environment.

The numbers of FSA funded medium CAFOs do not alone tell the whole story of their cumulative effects. The waste, disease, and other consequences of operations that tightly confine animals significantly affect public health and the environment in a variety of ways.

> #### 1. *Air pollution.*

CAFOs—including medium CAFOs—release harmful air pollutants. *Waterkeeper Alliance*, 853 F.3d at 536 (noting that "people have become seriously ill and even died" as a result of toxic air emissions from CAFO manure "pit agitation"); *see also* Martin Decl. ¶¶ 8, 19, 22-26. According to a worksheet that EPA previously placed on its website to allow CAFO operators to calculate their estimated emissions of air pollutants, medium CAFOs with more than 1,800 pigs are expected to emit 100 pounds of toxic ammonia or more *per day*. Stella Decl. Ex. 2 (EPA worksheet). And in the context of ozone, the number and concentration of CAFOs in certain areas of the country, like the San Joaquin Valley in California, have contributed to the areas' ambient air designation as "extreme nonattainment" for air pollution under the Clean Air Act. *See* Frantz Decl. ¶¶ 4, 10-12 (describing ozone pollution and its effect on his respiratory health). FSA continues to provide loan assistance for the creation and expansion of medium CAFOs in the San Joaquin Valley. *See id.* ¶ 5 & Exs. A, B.

CAFO production and its associated waste disposal practices also generates other air pollution in the form of methane and nitrous oxide—two of the six powerful greenhouse gases that "together constitute the root cause of" climate change. 74 Fed. Reg. 66517 (Dec. 15, 2009) (describing the six key greenhouse gases); *see In re: Daley Farms*, No. A19-0207, slip op. at 15

(Minn. Ct. App. Oct. 14, 2019) (vacating dairy CAFO permit because the agency "should have considered" the CAFO's greenhouse gas emissions as a "potentially significant environmental effect") (Stella Decl. Ex. 3). A recent EPA report calculating agriculture's contribution to climate change found that methane emissions related to manure management increased 66% over the same time period. EPA, *Inventory of U.S. Greenhouse Gas Emissions and Sinks: 1990-2017*, EPA 430-R-19-001 at 5-10 (2019) (citing, as a cause of the increase, the shift to CAFOs that "use liquid manure management systems, which have higher potential CH4 (methane) emissions than dry systems").[13] In short, FSA's loan assistance has significant harmful effects on air quality. *Cf. WildEarth Guardians*, 368 F. Supp. 3d at 77 (noting that cumulative impacts analysis must consider impacts "of [greenhouse gas] emissions generated by past, present, or reasonably foreseeable BLM lease sales in the region and nation").

2.  *Water pollution.*

FSA's lending actions to support the creation and expansion of medium CAFOs also have cumulatively significant effects on surface and groundwater quality. In findings published in the Federal Register, EPA determined that "[a]gricultural operations, including CAFOs, now account for a significant share of the remaining water pollution problems in the United States." 68 Fed. Reg. 7176, 7181 (Feb. 12, 2003). Agriculture is in fact "the leading contributor of pollutants to identified water quality impairments in the Nation's rivers and streams." *Id*. Twenty-nine states have more recently made similar findings, identifying CAFOs as contributors to water quality impairment in EPA's 2009 National Water Quality Inventory. 76 Fed. Reg.

---

[13] *Available at* https://www.epa.gov/sites/production/files/2019-04/documents/us-ghg-inventory-2019-main-text.pdf.

65431, 65434 (Oct. 21, 2011). These government documents corroborate the overwhelming scientific evidence that CAFOs pollute surface and groundwater bodies.

Moreover, as some of the Plaintiffs explained in comments on the Proposed Rule, "USDA in fact has published considerable data showing the overconcentration of CAFOs and AFOs in particular watersheds are a significant cause of seriously impaired waterways." AR 1488; *see also, e.g.*, Gollehon et al., *Confined Animal Production and Manure Nutrients*, USDA Econ. Res. Serv., Agric. Info. Bulletin 771 (2001) (explaining that the trend toward concentrating CAFOs within discrete geographical areas raises concerns over the ability to maintain water quality in a particular watershed).[14] CAFOs concentration within a watershed, with the resulting impaired water quality impairment, is borne out by the experiences of members of several plaintiffs in this case. See, e.g., Anderson Decl. ¶¶ 17, 19-20 (explaining "concentration in [local] watershed increase[d] . . . toxic microcystin levels"); Schumacher Decl. ¶¶ 5-8 (discussing chicken CAFOs upstream on rivers he uses); Bough Decl. ¶¶ 11-13 (describing 97 CAFOs in her county, and at least two polluting nearby Wildcat Creek).

### 3. *Water overconsumption.*

Actions supporting the creation and expansion of medium CAFOs also affect water resources by causing significant reductions in the availability of water for consumption. *See Delaware Riverkeeper*, 753 F.3d at 1318-20 (decreased groundwater access may be a significant cumulative impact). Pig and dairy CAFOs are extremely water intensive. *See, e.g.*, NALBOH Report 8 (discussing standing water in manure lagoons). And these are just the operations onsite. Once the animals or animal products ship for slaughter or processing (which are part and parcel

---

[14] *Available at*
https://www.ers.usda.gov/webdocs/publications/42398/17786_aib771_1_.pdf?v=0.

of industry production and, therefore, are indirect effects of CAFO funding that must be considered under NEPA, *see* 40 C.F.R. § 1508.8(b)), those processes consume even more water. FSA's lending actions to support medium CAFOs are occurring in areas regularly plagued with limited available water, exacerbating drought conditions. *See, e.g.*, Frantz Decl. Exs. A&B *with* News Release, "USDA Designates 24 Counties in California as Primary Natural Disaster Areas," Feb. 27, 2017 (noting FSA funding of medium CAFOs in same counties where FSA is also providing emergency drought relief to crop farmers who do not have access to enough water).[15]

### 4. *The spread of disease and antibiotic resistance.*

Further still, the increased concentration of animals from FSA's funding of medium CAFOs has the cumulatively significant public health effect of an increased risk of the spread of antibiotic resistance. *See* 40 C.F.R. § 1508.27(b)(2) (defining "significantly" by degree to which action "affects public health or safety"). CAFOs frequently provide antibiotics to a flock or herd of animals in steady low doses to avoid the spread of diseases that can rapidly spread in tightly confined CAFOs; this strongly encourages drug resistance. Martin Decl. ¶¶ 11-12 (explaining how "[a]dministering antibiotics to animals at levels too low to treat disease fosters proliferation of antibiotic-resistant pathogens," which are "more difficult and expensive to treat" and "more fatal" than other strains). And this resistance can spread to humans living nearby. *Id.* ¶ 13. For example, a recent scientific study of veterans in rural Iowa found that the risk of antibiotic-resistant *Staphylococcus aureus* (an antibiotic-resistant bacteria species known as MRSA) was 88% higher among veterans living within one mile of high-density pig CAFOs. *See id.* ¶ 16

---

[15] *Available at* https://www.fsa.usda.gov/state-offices/California/news-releases/2017/stnr_ca_20170228_rel001.

(noting Iowa study and other research finding that residents living near pig CAFOs have a greater risk of MRSA infection).

### 5.  *Environmental Injustice.*

The above-described cumulative effects of air and water pollution, water overconsumption, and increased risk of antibiotic resistance together have a disproportionate impact on environmental justice communities.[16] Here, FSA determined that the Proposed NEPA Rule would "not adversely and disproportionately impact minorities" and other protected classes. AR 358 (Civil Rights Impact Analysis). The Final Rule also explained that FSA implemented EO 12898, and Defendants now state in documents supporting their remand motion that FSA's CAFO funding supports members of groups who "have been subject to racial, ethnic, or gender prejudice." AR 1615; Peterson Second Decl. ¶¶ 6, 8 (Dkt. No. 31-2). To the contrary, the CatEx will increase racial disparities. *See Standing Rock Sioux Tribe*, 255 F. Supp. 3d at 136 (explaining environmental justice is judicially reviewable under NEPA when agency considers it, citing *Comtys. Against Runway Expansion v. FAA*, 355 F.3d 678, 689 (D.C. Cir. 2004)).

FSA actions lead to the siting of new or expanding medium CAFOs in environmental justice communities. *See* Frantz Decl. ¶ 5 & Exs. A-B (FSA funded dairy medium CAFO in an environmental justice area, as defined by EPA's Environmental Justice Mapping and Screening Tool); *see also* Tucker Decl. ¶ 7 & Ex. A (noting the loan-supported CAFO next to mobile home park). Moreover, federal government documents demonstrate clear negative effects of CAFOs on environmental justice communities. *E.g.*, Jan. 12, 2017 EPA External Civil Rights Compliance

---

[16] The Executive Order for "environmental justice" in agency decision making describes the relevant communities as "minority population and low-income populations in the United States and its territories and possessions." EO 12898, 59 Fed. Reg. 7629 at § 1-101 (Feb. 11, 1994).

Office Letter of Concern to N.C. Dep't of Envtl. Quality (describing discriminatory health and quality of life impacts from permitted pig and poultry CAFOs).[17]

>    6.    *Effects on wildlife and the animals confined at medium CAFOs.*

FSA lending support for medium CAFOs also has cumulatively significant effects on animals. CAFOs, including medium CAFOs, have the potential to adversely affect endangered or threatened animals or their critical habitat. *See* 40 C.F.R. § 1508.27(b)(9). In 2014, a federal court vacated FSA's environmental assessment for its financing of a 6,500 pig CAFO, partly on the basis that the agency did not consider the CAFOs effects on the endangered Gray bat, which "lived in caves and foraged around" the CAFO. *Buffalo River Watershed Alliance v. USDA*, 2014 WL 6837005, *1, 4 (E.D. Ark. Dec. 2, 2014). Only three medium CAFOs concentrated together would produce just as much waste—or more—as the CAFO at issue in *Buffalo River Watershed Alliance*, and similarly risk adversely affecting endangered animals like the Gray bat.

This is not an isolated case. For example, FSA funding of medium CAFOs in Minnesota threatens adverse effects on endangered and threatened mussels. The l pig CAFO industry uses ractopamine, a beta-agonist animal drug that is "slightly toxic" to aquatic invertebrates. *See* Elanco Animal Health, PAYLEAN Premix Material Safety Data Sheet at 6.[18] In Minnesota, there are several endangered mussels whose habitat is the Mississippi and St. Croix Rivers. *See,*

---

[17] *Available at* https://www.epa.gov/sites/production/files/2018-05/documents/letter_of_concern_to_william_g_ross_nc_deq_re_admin_complaint_11r-14-r4_.pdf. While FSA now states that minority communities will benefit from the categorical exclusion through increased funding, the Final Rule only justified the CatEx on the basis it would remove impediments to financing for "young or beginning farmers," and not also "socially disadvantaged farmers." *Compare* AR 1610 *with* Peterson Second Decl. ¶¶ 6, 8 (Dkt. No. 31-2). Regardless, FSA did not consider any harms that could come to those communities, and "the cumulative impacts analysis cannot focus only on the beneficial effects" of an action, demonstrating another error in FSA's rulemaking. *Bosworth*, 510 F.3d at 1029.

[18] *Available at* https://www.asp-inc.com/products/documents/prodinfo/p/payleanmsds.pdf.

*e.g.,* U.S. Fish & Wildlife Service Environmental Conservation Online System.[19] FSA records show that the agency is regularly funding medium pig CAFOs within the Mississippi and St. Croix Rivers' tributary systems. *See* Lilliston Decl. ¶ 8 & Exs. B, C (identifying funding of pig CAFOs containing over 2400 pigs in Olmstead and Fillmore counties, among others).

Finally, medium CAFOs have are cumulatively significant because of the detrimental effects of their operations on the animals confined within the operations. *Cf. Am. Oceans Campaign*, 183 F. Supp. 2d at 20 (agency failed to consider how "fishing practices and gear may" damage fish habitat and harm healthy fish populations). For instance, the intensive confinement and steady provision of low-dose antibiotics, among other practices at CAFOs, cause an increased risk that the confined animals will be susceptible to antibiotic resistant bacteria and other disease. Martin Decl. ¶¶ 11-13.

* * * *

In short, the national reach of the Medium CAFO CatEx and the massive number of land acreage, water bodies, community populations, and sensitive species that will be adversely affected by FSA's funding of medium CAFOs clearly demonstrate that medium CAFOs have cumulatively significant effects on the environment, prohibiting categorical exclusion.

## II.    VACATUR IS THE APPROPRIATE REMEDY.

The Court should vacate the Medium CAFO CatEx, because vacatur is the standard remedy for the Defendants' violations of the APA and NEPA, and FSA does not meet either, much less both, of the *Allied Signal* factors in favor of remand without vacatur.

---

[19] *Available at* https://ecos.fws.gov/ecp0/profile/speciesProfile?spcode=F009 (Higgens eye (pearlymussel); https://ecos.fws.gov/ecp0/profile/speciesProfile?spcode=F00X (Spectaclecase (mussel)); https://ecos.fws.gov/ecp0/profile/speciesProfile?spcode=F03J (Snuffbox mussel).

### A.  Vacatur Is the Standard Remedy for Violations of NEPA and the APA.

Because FSA committed several violations of NEPA and the APA in issuing the CatEx,
and because FSA medium CAFO actions have cumulatively significant effects, the Court should
vacate and enjoin FSA's use of the CatEx. *See Bosworth*, 510 F.3d at 1028 (vacating and
enjoining application of Forest Service categorical exclusion for failure to do impacts analysis
where, as here, "the categorical is nationwide in scope and has the potential to impact a large
number of acres"); *Heartwood, Inc. v. USFS,* 73 F. Supp. 2d 962, 976 (S.D. Ill. 1999), *aff'd* 230
F.3d 947 (7th Cir. 2000) (vacating and enjoining application of timber harvest categorical
exclusion, in part because the agency "failed to adequately address or provide support for its
position that the timber harvests of these magnitude would not have cumulative effects on the
environment").

Moreover, "pursuant to case law in this Circuit, vacating the rule or action promulgated
in violation of NEPA is the standard remedy." *Humane Soc'y*, 520 F. Supp. 2d at 37 (collecting
cases) (vacating interim rule that agency promulgated by improperly applying categorical
exclusion); *see also Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014)
(stating "vacatur is the normal remedy" for an APA violation). As the above sections
demonstrate, FSA's promulgation of the CatEx was arbitrary and capricious and in violation of
NEPA and the APA. That should be the end of the matter and lead straight to vacatur.[20]

Nevertheless, Defendants argue against this "standard remedy" because they believe
there is a "serious possibility" the agency will fix the Medium CAFO CatEx deficiencies on

---

[20] Indeed, at one point Defendants believed the CatEx deficiencies to be so serious that FSA
planned to rescind that portion of the Final NEPA Rule. *See* Peterson Decl. ¶ 4 (Dkt. No. 27-1)
(stating "FSA has concluded that additional analysis of FSA's NEPA Rule regarding CAFOs is
needed" and proposing to rescind the CAFO provisions of the rule and revert to a procedure
using environmental assessments to review medium CAFO actions).

remand, and because vacatur would have "disruptive consequences" on industry. Vol'y Remand

Mot. 14-18 (Dkt. No. 31) (referencing the two-factor test in *Allied-Signal, Inc. v. U.S. Nuclear*

*Regulatory Comm'n*, 988 F.2d 146 (D.C. Cir. 1993)). Defendants have not, and cannot, meet

their burden of demonstrating that both *Allied-Signal* factors favor remand without vacatur. *See*

*Haw. Longline Ass'n v. NMFS*, 288 F. Supp. 2d 7, 12 (D.D.C. 2003) (Kollar-Kotelly, J.)

(explaining that a court "may remand without vacatur where there is [1] at least a *serious*

*possibility* that the agency will be able to substantiate its decision given an opportunity to do so,

and [2] when vacating would be disruptive") (quotations omitted, emphasis in original).

### B. There Is No Serious Possibility That FSA Can Substantiate Its Unlawful Rule or Will Promulgate a Lawful Rule on Remand.

In an effort to satisfy the first *Allied-Signal* factor, Defendants ignore the fact that

medium CAFOs have cumulatively significant impacts and seek to minimize the CatEx problems

as solely "procedural." Vol'y Remand Mot. 14-16 (Dkt. No. 31). As shown above, the

deficiencies are not purely "procedural." Because FSA's Final Rule impermissibly categorically

excludes actions with significant impacts from review, it cannot overcome this deficiency on

remand. Defendants' brief shortchanges the CatEx deficiencies, and their plan for remand does

not offer a "serious possibility" that FSA will fix the mistakes by reversing the Final Rule and

eliminating the Medium CAFO CatEx.

This Court in *National Parks Conservation Association* illustrated how agency action

with both procedural and substantive errors call for vacatur. In that case, as here, the defendants

contended the agency's failure to initiate a consultation under Section 7 of the ESA when it

promulgated a rule was "merely a strictly a procedural defect." *Nat'l Parks Conservation Ass'n*,

62 F. Supp. 3d at 20. The Court disagreed, explaining that the relevant ESA provision "contains

both a procedural requirement to pursue consultation with the Service and a substantive

requirement to ensure that the proposed agency action is not likely to jeopardize the continued existence of an endangered or threatened species or adversely affect critical habitat." *Id.* Because it was "mere speculation" that the agency's rule would not cross the ESA jeopardy "threshold," the Court found the agency's consultation failure a "serious deficiency." *Id.* at 20 & 21 n.17.

Similarly, here NEPA's requirements for categorical exclusions have both a substantive and procedural requirement.[21] FSA may not promulgate a categorical exclusion without analyzing whether the excluded actions have significant effects on the environment; it did no such analysis here, and so clearly violated a substantive "threshold." *See Nat'l Parks Conservation Ass'n*, 62 F. Supp. 3d at 21 n.17. This error is all the more apparent in light of medium CAFOs' obvious and myriad cumulative effects, which demonstrate that FSA cannot substantiate with paper the CatEx on remand. *See* Argument Section I.C, above (describing, *inter alia*, impacts to air quality, climate change, water quality, and sensitive species and ecosystems).

Defendants contend "Medium CAFOs under the prior rule rarely had impacts that should have met NEPA's threshold for an EA." Vol'y Remand Mot. 15 (Dkt. No. 31) (citing AR 318 and Fuller Declaration). Neither of the two citations they provide support this *post hoc* assertion; they say nothing about medium CAFOs. Indeed, Defendants' brief earlier contradicts the assertion when explaining FSA does not know "the size of the facilities for which past NEPA documents were considered." *Id.* at 12 (stating "some of which *presumably* were medium CAFO financial assistance") (emphasis added). This "mere speculation on the part of" Defendants is not enough to avoid vacatur. *Nat'l Parks Conservation Ass'n*, 62 F. Supp. 3d at 21 n.17.

---

[21] The CEQ regulation makes clear that there are both substantive and procedural requirements for categorical exclusions: "Categorical exclusion means a category of actions which do not individually or cumulatively have a significant effect on the human environment *and* which have been found to have such effect in procedures adopted by a Federal agency in implementation of these regulations . . . ." 40 C.F.R. § 1508.4 (emphasis added).

Further, FSA failed to give notice and accept public comment on the CatEx; this violated NEPA, its implementing regulations, and the APA. Yet nowhere in its voluntary remand motion or associated papers does FSA explain it will give public notice and seek comment on the CatEx. *See generally* Fuller Decl. (Dkt. No. 31-1).[22] Thus, even as to the procedural deficiencies, FSA's planned remand provides *no* possibility, let alone a "serious" one, that FSA will fix the infirmities. *See Haw. Longline Ass'n*, 288 F. Supp. 2d at 12; *see also Defenders of Wildlife v. Jackson*, 791 F. Supp. 2d 96, 118 (D.D.C. 2011) ("Failure to provide notice and comment is a fundamental flaw that normally requires vacatur of the rule") (citing D.C. Circuit cases).

### C.  Vacatur Will Return FSA Review to the Prior Rule Process, Which is Far Less Disruptive and Prejudicial than the Current Free-for-All.

Defendants also have not shown that the second *Allied-Signal*, regarding "disruptive consequences," favors remand without vacatur.

Vacating the CatEx will have limited disruptive consequences because it will simply return FSA's medium CAFOs to the longstanding regulatory regime that preceded the Final Rule. Again, *National Parks Conservation Association* is illustrative. This Court held that because vacatur "would result in the reinstatement of [a rule] which governed surface mining activities for over 25 years and with which the regulated community is familiar," vacating the rule was appropriate. *Nat'l Parks Conservation Ass'n*, 62 F. Supp. 3d at 21.*see also Georgetown Univ. v. Bowen*, 821 F.2d 750, 757-58 (D.C. Cir. 1987) ("This circuit has previously held that the effect of invalidating an agency rule is to *reinstate* the rules previously in force") (emphasis in original, quotation omitted). Here, the prior rule, which required EAs for FSA actions related to

---

[22] Should FSA respond to this motion by asserting for the first time it will follow notice and comment, its statements confirm that it only seeks to come up with a *post hoc* rationalization for the CatEx, rendering any public process a sham.

many medium CAFOs, governed loan activities for CAFOs for over 25 years. *See* AR 1 (citing

53 Fed. Reg. 36237 (Sept. 19, 1988)). The "regulated community is familiar" with the regulatory

process, as evidenced by the thousands of FSA guaranteed loans for agricultural facilities,

including CAFOs, during just the 2010-11 time period. AR 9768-9779 (categorizing the

guaranteed loans into Class I EA, Class II EA, and categorical exclusion actions); AR 9780-9941

(spreadsheet of all actions). Defendants have already acknowledged that reinstatement is

feasible, *see* Vol'y Remand Mot. 17-18 (Dkt. No. 31), and indeed have already explained exactly

how it would happen. *See* Peterson Decl. ¶ 5 (Dkt. No. 27-1).[23] Thus, under the analysis that

courts in this Circuit have used, vacatur would have limited disruptive consequences. *See Nat'l*

*Parks Conservation Ass'n*, 62 F. Supp. 2d at 21.

      Ignoring the fact that the CAFO industry has long been governed by the prior rule,

Defendants try to refocus vacatur as inflicting harm on small family farmers. *See* Vol'y Remand

Mot. 17 (Dkt. No. 31); Peterson Second Decl. ¶¶ 7-8 (Dkt. No. 31-2). But the agency's own

words in the record belie this claim: FSA explained that the Proposed Rule, which would have

required EAs for medium CAFOs, amounted to a "minimal regulatory requirement" on "small

farming businesses." AR 356. This is an unsurprising conclusion because FSA's review of its

Guaranteed Loan Program for 2010-11 show that FSA approved hundreds to thousands of

guaranteed loans to CAFOs connected to an integrator. *See* AR 9765, 9780-9941.

      Defendants transparently seek to hide behind the straw man of speculative harms to

"family farms" while in actuality ignoring how independent farmers, rural communities, and

---

[23] For this reason, Defendants' references to the Proposed NEPA Rule and industry concerns
about that document miss the point. *See* Vol'y Remand Mot. 16 (Dkt. No. 31). Vacatur does not
return the Medium CAFO CatEx to the regulations in the Proposed NEPA Rule—which never
were "in force"—but rather to the prior rule. *See Georgetown Univ.*, 821 F.2d at 757-58.

their local businesses suffer from CAFO expansion *See, e.g.*, James Decl. ¶¶ 3-5 (Dakota Rural

Action has farmers as members and advocates for family farmers); Bough Decl. ¶ 1 (farmer who

provides eggs and produce to 15 families); Frantz Decl. ¶¶ 9-13 (third generation farmer who

suffers from dairy CAFO air pollution). Remand without vacatur would indefinitely continue this

disruption of communities' quality of life and access to clean air, water, and healthy ecosystems,

while FSA massages the Administrative Record to support its unlawful decision to categorically

exclude medium CAFOs. *See Vanda Pharmaceuticals, Inc. v. FDA*, 2019 WL 1198703, *2

(D.D.C. Mar. 14, 2019) (explaining that the second *Allied-Signal* factor asks "whether remand

without vacatur will unduly prejudice any party") (quotation omitted).

Moreover, this is not the first time a federal agency tasked with environmental regulation,

when sued over its lenient carve-out for the CAFO industry, has responded by seeking indefinite

voluntary remand without vacatur. After environmental and community groups sued EPA in

2009 for its exemption of certain-sized CAFOs from mandatory reporting of hazardous air

emissions, EPA requested and received voluntary remand without vacatur. Oct. 19, 2010 Order,

*Waterkeeper Alliance et al. v. EPA*, No. 09-1017 (D.C. Cir. Doc. #1272527). EPA never acted

during remand, keeping the regulation it acknowledged as problematic in place until the

environmental and community groups successfully moved to recall the mandate *five years later*.

Sept. 23, 2015 Order (D.C. Cir. Doc. #1574476). The D.C. Circuit ultimately vacated EPA's

regulatory carve-out for the CAFO industry as arbitrary and capricious after the illegal rule was

in effect, depriving communities of information critical to their health and well-being, for seven

years. *Waterkeeper Alliance*, 853 F.3d 527 (D.C. Cir. 2017).

Accordingly, because there is not a "serious possibility" FSA can fix its unlawful

decision on remand, and vacatur will not disrupt an industry long familiar with the prior rule

37

(while remand without vacatur would seriously prejudice Plaintiffs and their members), vacatur is the proper remedy. *See Haw. Longline Ass'n*, 288 F. Supp. 2d at 12.

## CONCLUSION.

For the reasons stated above, Plaintiffs respectfully request that the Court grant them summary judgment, declare the CatEx unlawful and vacate it, and remand the Final NEPA Rule to FSA.

Dated: Oct. 17, 2019

                                   */s/ Daniel H. Waltz*

                                   Daniel Waltz (f/k/a Daniel Lutz) (D.D.C. Bar No. D00424)
        The Yard, 700 Pennsylvania Avenue S.E. Washington, DC 20003
Cristina Stella (D.D.C. Bar No. CA00012)
        525 East Cotati Avenue
        Cotati, CA 94931
ANIMAL LEGAL DEFENSE FUND
Phone: (707) 795-2533
Email: dwaltz@aldf.org
             cstella@aldf.org

*Attorneys for Plaintiffs Institute for Agriculture and Trade Policy, Iowa Citizens for Community Improvement, Citizens Action Coalition of Indiana, Association of Irritated Residents, Food & Water Watch, and Animal Legal Defense Fund*

David S. Muraskin (D.C. Bar No. 1012451)
Jessica Culpepper, *pro hac vice*
        1620 L Street N.W., Suite 630
        Washington, D.C. 20036
PUBLIC JUSTICE, P.C.
Phone: (202) 861-5245
Email: dmuraskin@publicjustice.net
          jculpepper@publicjustice.net

Tarah Heinzen (D.C. Bar No. 1019829)
        1616 P Street N.W., Suite 300

Washington, D.C. 20036
FOOD & WATER WATCH
Phone: (202) 683-2457
Email: theinzen@fwwatch.org

*Attorneys for Plaintiffs Dakota Rural Action,
Institute for Agriculture and Trade Policy,
Iowa Citizens for Community Improvement,
Citizens Action Coalition of Indiana,
Association of Irritated Residents, White
River Waterkeeper, Food & Water Watch,
and Animal Legal Defense Fund*